Filed 6/20/25  In re Cooper B. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re COOPER B., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. KATHRYN B., Defendant and Appellant. | A170934 (Solano County Super. Ct. No. JD2400016) |

Kathryn B. (Mother) appeals from jurisdictional and dispositional orders in the dependency proceeding filed by the Solano County Health and Human Services Department (Department) on behalf of her son, Cooper B. (Minor).

Mother argues that the juvenile court judge, the Honorable Dora M. Rios, should have recused herself because, acting as the probate court in a guardianship proceeding concerning Minor and following the procedures set forth in section Probate Code, section 1513, subdivision (b), Judge Rios referred the matter to the Department for investigation and then applied to the juvenile court for review of the Department's decision not to initiate

1

dependency proceedings; a different judicial officer granted the application and ordered the Department to file the petition underlying this appeal. Mother acknowledges that when Judge Rios disclosed her role at the outset of the dependency proceeding, Mother stated she had no objection to Judge Rios hearing the case; Mother also acknowledges that she did not follow the procedures set forth in the Code of Civil Procedure for disqualification of Judge Rios. Mother argues that we must nevertheless reverse the court's jurisdictional and dispositional orders because Judge Rios's failure to recuse herself violated Mother's constitutional right to a fair trial or alternatively because Mother's attorneys' failure to follow the statutory procedures constitutes ineffective assistance of counsel. These arguments lack merit.

Mother also argues that the jurisdictional and dispositional orders are not supported by substantial evidence. We will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Probate Court Proceedings and Investigations*

In November 2023, Minor's maternal aunt (aunt) and her husband (uncle) filed a petition in probate court for guardianship of nine-year-old Minor and his 17-year-old maternal half-sister (sister).[1] The filing was precipitated by sister expressing concern to aunt about Mother's behavior and its effect on Minor. In the guardianship petition, aunt and uncle alleged under penalty of perjury that because of Mother's mental and physical illness, Minor and sister were not receiving medical or dental care, and Minor had never been enrolled in school. They alleged that Mother was delusional and believed there was a conspiracy against her and the children and that all of them had a fungus growing in their bodies. They also alleged that Minor

---

[1] Sister is not a party to this appeal, and we discuss facts concerning her only insofar as they bear on the issues before us.

2

was born addicted to drugs and had special needs that had not been addressed. The guardianship matter was assigned to Judge Rios.

1. *Judge Rios Applies to the Department for an Investigation*

On January 24, 2024, in her role as a judicial officer of the probate court and as authorized by Probate Code, section 1513, subdivision (b), Judge Rios signed Judicial Council form JV-210 "Application to Commence Juvenile Court Proceedings and Decision of Social Worker," stating that the court had been assigned to determine a petition for the appointment of a guardian for Minor and sister; had determined that the children "[are] or may be described by Welfare and Institutions Code section 300";[2] and was referring the children to the Department for an investigation as to whether juvenile court proceedings should be commenced.[3] In the space on the form for stating reasons why the children were or may be described by section 300, Judge Rios wrote, "severe neglect—mother suffers from mental health issues, substance abuse, delusions and paranoia." The completed form JV-210, along with the guardianship petition, was forwarded to the Department.

---

[2] Subsequent statutory references are to the Welfare and Institutions Code unless otherwise stated.

[3] Probate Code, section 1513, subdivision (b), provides that if a proposed ward in a guardianship proceeding "is or may be described by [section 300], the court may refer the matter, in writing, to the local child welfare agency to initiate an investigation pursuant to [section 329]." The Welfare and Institutions Code provides that if a social worker receives a referral from the probate court, "the social worker shall immediately investigate as necessary to determine whether proceedings in the juvenile court should be commenced." (§ 329, subd. (b)(1).) Within three weeks of the referral, the social worker must "report the findings and conclusions of the investigation, along with any decision made as a result and the reasons for the decision" to the probate court. (*Id.*, subd. (b)(2).)

In its report submitted on February 6, 2024, the Department declined to file a petition. The Department assessed that the allegation of general neglect on behalf of Minor and sister was inconclusive, while noting that the social worker was unable to investigate thoroughly because Mother did not allow her to speak privately with Minor or to assess the home for safety. The reporting social worker had communicated with sister by text but not in person: sister told her Mother would be "very upset" if she met with the social worker. The social worker spoke with Mother, who frequently "chang[ed] the subject and rambl[ed] about things irrelevant to the current topic," and with maternal grandmother (grandmother). The social worker also spoke with Minor in the presence of Mother and grandmother, and reported that Mother attempted to control the questions posed and dictate how Minor should answer them. The social worker reported that an August 2023 referral to the Department alleging general neglect had been substantiated as to sister and was inconclusive as to Minor.

In its "Assessment/Evaluation" the Department wrote, "It is concerning that [Minor] has never been enrolled in any formal schooling and the mother has claimed, for several months to be addressing this, but declined to provide proof of any communication or attempts at enrollment for [Minor]. The Department is concerned about [Minor's] future outcome and the challenges he may unnecessarily face as a result of such limited opportunities for social interaction with peers, as well as the disadvantages of lack of academic structure."

2.    *Report from the Probate Court Investigator*

Meanwhile, on February 2, 2024, the probate court investigator had filed a report and recommendation in the guardianship proceeding. (See Prob. Code, § 1513, subd. (a)(2) [as a general matter, when a proposed

4

guardian is a relative, court investigator must file a report including social history of proposed ward].)  The investigator interviewed aunt and maternal grandfather, and also interviewed sister in person.  Sister planned to move to aunt and uncle's home upon turning 18 regardless of whether guardianship is granted, and she was concerned about leaving Minor in Mother's care.

The investigator recommended granting a temporary guardianship for sister, to expire on her 18th birthday.  The recommendation was based on sister's reports that she had untreated health issues, reports from sister and her school that sister had so far missed almost half the school year for health-related reasons, and a video in which Mother stated it would not help to take Minor and sister to see a doctor or dentist for their health issues and referred to an infection that she and the children have that the doctors are covering up.

As for Minor, the investigator concluded there was support for the allegations that he had never been in school and that Mother had neglected his healthcare needs.  The investigator was "very concerned about" Minor and recommended the court appoint counsel to represent him in the guardianship proceedings "and advocate for his education, healthcare, and behavioral service needs."  The investigator noted that the guardianship petition could not be granted "at this time" because Mother had not received notice of the proceedings,[4] but recommended granting a temporary guardianship if child protective services declined to intervene on Minor's behalf.

---

[4] Sister informed the investigator that Mother refused to answer the door when the sheriff attempted service.

3. *Judge Rios Applies for Review of the Department's Decision*

Confronted with the two reports, Judge Rios, acting under Probate Code section 1513, subdivision (b)(4), filed Judicial Council form JV-212 "Application to Review Decision by Social Worker Not to Commence Proceedings," requesting the juvenile court to review the social worker's decision and issue an order directing the social worker to commence juvenile court proceedings.[5] The application was supported by the probate court investigator's report, the form JV-210, and the social worker's report.

A different judicial officer, Judge Davis, reviewed the evidence and on February 9, 2024, ordered the Department to file a petition under section 300.[6] (See § 331, subd. (b) [in response to request from probate court for review of social worker's decision not to commence proceedings, "[t]he juvenile court may either affirm the decision of the social worker or, if it finds that the child is, prima facie, described by Section 300, order the social worker to commence juvenile court proceedings"].)

---

[5] Probate Code section 1513, subdivision (b)(4), provides that "[i]f the child welfare agency has not, within three weeks of the referral, notified the probate court that it has commenced juvenile dependency proceedings, the probate court . . . may apply to the juvenile court, pursuant to Section 331 of the Welfare and Institutions Code, for an order directing the agency to commence juvenile dependency proceedings." Section 331 requires the juvenile court to "make[ ] an independent assessment to determine whether there is a prima facie showing the child comes within section 300 and whether a dependency petition is required to protect the child." (*In re Kaylee H.* (2012) 205 Cal.App.4th 92, 104, italics omitted.) If the juvenile court commences dependency proceedings, the guardianship proceedings are stayed. (Prob. Code, § 1513, subd. (b)(5).)

[6] Subsequent dates are in 2024 unless otherwise stated.

B.    *Dependency Petition*

On February 15, the Department filed a petition alleging that Minor and sister came within the jurisdiction of the juvenile court under section 300, subdivision (b)(1). The petition alleged the children had suffered or were at substantial risk of suffering serious physical harm or illness as a result of Mother's failure to supervise or protect them adequately and Mother's inability to provide regular care for them due to mental illness or substance abuse. The petition alleged that Mother failed to obtain adequate medical care for the children due to her belief that they had fungal infections caused by the government; that Mother failed to address sister's dental needs, resulting in her suffering excruciating pain for a prolonged period; and that Minor suffered from permanent eye damage because Mother failed to timely address his vision issues. The petition further alleged that Mother failed to enroll Minor in school, and that as a result he was academically behind and unable to write.

An amended petition as to Minor alleged in addition that he came within the jurisdiction of the court under section 300, subdivision (j) (abuse of sibling), based on allegations that sister suffered or was at substantial risk of suffering serious physical harm or illness from Mother's failure to obtain adequate and timely medical care for her significant dental needs because of Mother's belief that sister had fungal infections in her body caused by the government, and that such actions by Mother placed Minor at substantial risk of serious physical harm or illness.[7]

---

[7] The Department later recommended that the court sustain allegations under section 300, subdivision (g) (no provision for support), as to Minor's alleged father, and the court did so. Minor's alleged father did not appear in the proceedings below and is not a party to this appeal.

7

In its initial report the Department recommended that Minor and sister, who were currently living in Mother's home, be detained from Mother's care pending investigation and a jurisdictional hearing.

## C.     *Detention Hearings*

### 1.     *Initial Hearing*

A detention hearing was held on February 16.  At the outset, the court announced that the matter was on calendar following the court's referral to child protective services.  The court explained:  "This is following a petition to establish a guardianship.  There was some information in the Court investigator's report and also information provided by the proposed guardian, who's actually present in the courtroom, [aunt], indicating to the Court that Child Protective Services was involved with this family, and then a recommendation from the Court Investigators' Office to make the referral. [¶] The Court did make a referral.  So I want the parties to know that the referral did come from me.  [¶] There was a return on that referral, and that was—I did ask that there be a second look at it or a review of that.  And a different judicial officer then made the decision to direct the department, I think, to open a petition."  After the Department's counsel confirmed the court's account, the court continued, "And so I just want to make that known, in case anybody present wants to indicate an objection to having me hear the matter, although I don't believe that I have a conflict."  Mother's appointed attorney consulted with Mother and then reported, "No objection, Your Honor."

Mother requested that Minor's case be bifurcated from sister's; requested a contested detention hearing for Minor and objected to his being removed from her care in the interim; and requested a contested detention hearing as to sister, but did not contest sister's interim detention.  The court

8

granted Mother's request to bifurcate the cases; ordered Minor detained pending a contested detention hearing; and ordered supervised visitation.

### 2. *Contested Detention Hearing*

Mother was not present at the contested detention hearing for Minor on February 21. Her counsel stated that although Mother had previously said she did not object to Judge Rios hearing the case, Mother now objected and requested a different judge "on the basis of the way this came in." The court declined to recuse itself, stating that despite its filing the form JV-210 and its knowledge of the guardianship case, it could be fair.[8]

The court admitted the Department's initial hearing report into evidence; took judicial notice of the previously-filed forms JV-210 and JV-212;

---

[8] In responding to the objection, the court described the background of the proceeding in detail, noting that it handled the guardianship calendar and explaining, "I do have an obligation, if I see a situation where I think Child Welfare Services should be involved, then I do have an obligation and an ability to request Child Protective Services to at least have a look. [¶] And as part of the guardianship process, the Court Investigator's Office is required to conduct an investigation and provide the Court with a recommendation as to what—as to what I should do regarding the petition for guardianship. And one of the recommendations was for the Court to proceed via a JV-210, ask Child Protective Services to look at the home situation. [¶] In addition to that, I was told by the proposed guardian, [aunt], who's not present, that Child Protective Services was already involved with the family. And they were already trying to talk to mom and trying to talk to the kids. [¶] Then what occurred, because Child Protective Services was not successful in talking to mom and I think talking to [sister], but the court investigators was [*sic*] able to talk to [sister]. So there was a double investigation with information, not shared, necessarily. [¶] But once the Court received both reports, the Court saw that there was a need for at least a different judge to review the reports, the Child Protective Services report, and also my JV-210, along with the court investigator's report. And for that judicial officer to either decide whether there should be no petition, or a petition should be instigated or started. And so that was Judge Davis. It wasn't me."

9

heard argument; and ordered Minor detained and placed in aunt and uncle's home in southern California, where sister had also been placed. The court ordered in-person visitation at least twice a month as well as daily monitored phone calls between Minor and Mother. Mother was to be provided with alcohol and drug testing, substance abuse treatment, parenting education, and a mental health assessment pending the jurisdictional and dispositional hearing, which was set for April 4.

D.    *Jurisdiction and Disposition*

1.    *Department's Report*

In its March 29 Jurisdiction/Disposition Report, the Department recommended the court continue Minor's detention, sustain the allegations under section 300, subdivision (b) as to Mother, adjudge Minor a dependent of the court, and provide Mother with family reunification services. The Department reported that both Minor and sister were currently placed with aunt.

Aunt told the social worker that Mother had been abusing prescription drugs for at least 20 years, and that Mother had mental health issues that predated her drug use.

Minor told the social worker that Mother did not take him outside much or allow him to play outside and that he did not go to school or have any friends. He said that while living with Mother he had hung out, watched TV and played videogames. He had never done any homeschool. He told the social worker that Mother lies a lot, including things like telling him to be careful about drinking milk because it will make his skin white. He said he went to the doctor sometimes, but that "doctors are evil. They can probably treat you, but they don't." He said he learned that from Mother. He said he had gone to the dentist, and Mother told him dentists are evil also. He

10

reported that Mother gave him NyQuil every night and told him it was to help him sleep.

Minor was scheduled to begin school in a few days. Aunt was concerned about possible developmental delays and planned to have Minor assessed by the school psychologist. The social worker did not observe any intellectual or developmental delays, but noted that Minor did not know how to hold a fork or a pencil, which she suggested could be "related to neglect."

The Department reported that Mother had participated in substance testing in the weeks since the detention hearing: three of four tests were normal, one was positive for "opiates – oxycodone." Mother denied alcohol or substance use, and said she used prescribed medication, including oxycodone, for pain. Mother was asked to provide a photo of her medication bottles, but did not do so. She denied any mental health issues. Mother told the social worker that Minor had been participating in home school since he was two years old, and could read and write, and that they were currently working on subjects including arithmetic, the periodic table, states and their capitals, the metric system, latitude and longitude, animals and reptiles, and history.

When the social worker told Mother about concerns that her children's medical needs were not being met, Mother responded that when sister was in sixth grade she had a "serious leg infection . . . diagnosed as a fungal infection by her pediatrician. She had significant issues. She had surgery. The dental issues developed at the same time. . . . She required an additional referral for an endodontist. She was seen for several appointments. So I'm not sure why people are saying I didn't get them medical care."

Sister, now 18, reported to the social worker that since about 2018 Mother had believed that sister and Minor had fungus and parasites caused by the government. Mother took them to the doctor for things Mother

11

thought were wrong, but when they went to the doctor for an actual problem, if the doctor said something Mother disagreed with, she would not follow up with treatment, and she stopped taking them to the doctor. Sister said the issues with her knee that Mother insisted were due to a fungal infection were actually the result of her tripping and falling, dislocating her kneecap and breaking a bone in her knee. Sister also reported that she missed a lot of school because she was in constant pain because of her teeth. When she told Mother her teeth hurt, Mother said she needed to see an ear, nose, and throat doctor to fix an infection; when the doctor said there was no infection, Mother told sister, "They're lying to us."

Sister said things became worse during the COVID lockdown. Mother told people that she was homeschooling Minor, but she was not. Minor had no formal education but instead played games on Mother's phone, or watched videos or TV.

Sister reported that Mother took prescribed pain medicine and bought additional medicine from a friend or was given more by grandmother; Mother crushed the pills and snorted them, including when she and Minor were in the room, and this had been going on since sister was three or four years old.

There had been two in-person supervised visits between Mother and Minor by the time of the report. During one visit, Mother and grandmother had to be redirected multiple times for saying inappropriate things about the case to Minor. Minor reported that during visits they "talk about stuff, play with toys and do fun stuff." As for the daily phone calls, Minor reported he did not always want to talk on the phone because it was boring. Aunt and uncle would ask if he wanted to talk on the phone and he would say, "no thanks."

The Department assessed that Minor would not be safe in Mother's care because Mother "has ongoing and untreated mental health and/or substance use problem, which has impaired her ability to safely care for [Minor], and has impacted her overall understanding of safety and what is needed to provide care to [Minor]." The Department concluded that the risk of abuse or neglect was "Very High" based on Mother's prior referral history; her current and ongoing unaddressed mental health issues; her substance use; her lack of understanding of Minor's needs; her neglect of Minor's medical and dental needs; and her never enrolling Minor in school.

2. *Contested Hearing*

The combined contested jurisdiction and disposition hearing did not go forward until June 28. The delay was due in part to new counsel being appointed for Mother after the court held a *Marsden* hearing (*People v. Marsden* (1970) 2 Cal.3d 118) and found that the attorney-client relationship between Mother and her first appointed counsel had broken down.

The hearing was held over three days in June and July. The trial court admitted into evidence the social worker's initial and jurisdiction/disposition reports, the forms JV-210 and JV-212 and several exhibits, and heard testimony from witnesses including aunt, the social worker, and Mother, as well as sister, who testified as a rebuttal witness.

a. *Aunt's Testimony*

Aunt testified that she and Mother used to talk and text frequently, but had not spoken in about a year because Mother's personality had "drastically changed." Before the children were removed from Mother's care, aunt saw them every month or two, and also texted with sister daily, and communicated with Minor through a video app. Aunt testified that Mother

13

had physical health issues, including pain from injuries over the course of her life.

In about 2018 Mother started to claim that she, the children, and the family dog had infections; the claims escalated in 2020. Mother told aunt the children were born with the infection; that Minor had gone blind from the infection overnight; and that the children's teeth were affected, but it was pointless to go to the dentist because the infection had to be fixed first. At different times in 2020 and 2021, sister reached out to aunt saying she was in a lot of pain from her teeth. Sister said it felt like her teeth were cracked, she could not eat or sleep, she was missing school, and Mother would not take her to the dentist.

Aunt testified that eventually sister reached out to child protective services, which led only to a finding of neglect. Sister then reached out to aunt, who learned about the possibility of guardianship as a way to help sister. Asked what aunt meant by stating in the guardianship petition that sister and Minor were not getting medical care, aunt explained that she did not know about Minor, but there was not "complete care" for sister: Mother would not follow up on dental appointments "because of the fungus."

b. *Social Worker's Testimony*

The social worker reported that sister had been to the dentist since being detained from Mother. The dentist determined that two teeth with root canals had cracked because they never received permanent crowns, and would have to be extracted; sister also needed seven additional fillings, which had since been completed. The social worker had interviewed Minor about going to the dentist: he said the last time he had been to the dentist was a couple of years before the interview. Minor had no acute dental issues or any medical issues at the time he was detained from Mother.

14

The social worker testified she was concerned about Mother's mental health based on reports that Mother believed the children had a fungus or infection caused by the government, although Mother had never suggested to the social worker that she had such a belief. The social worker was concerned about Mother's substance use based on sister's report that Mother abused prescription drugs by regularly crushing and snorting them in front of sister and Minor. Mother had four abnormal drug test results between March 1 and May 2, including two that were positive for Mother's prescribed oxycodone; the tests did not show whether Mother was using the drug according to the prescription or not.

Minor had told the social worker that he loves going to school, learning, and interacting with the students and his teacher. Minor's teacher reported that Minor's reading had initially been at a first-grade level, but had improved; his math was at a third-grade level. Minor struggled in writing because he did not know how to hold a pencil. He also had difficulty using scissors.

Mother's visits with Minor had presented "challenges," including Mother's tendency to talk about the case and about Minor coming home. Minor had asked for a recent visit to end early; the visit supervisor reported that at the visit Mother was "condescending" in responding to information Minor shared about school. There were also reports that Mother was "gaslighting" Minor. The social worker had observed this behavior at a visit when Minor talked about riding his bike at aunt's house; Mother said that he always did that at home; and Minor responded, "I don't remember that. No, I didn't." After the visit, Minor said, "I'm worried that something is wrong with me, there's something wrong with my memory because all of these things my mom is telling me is not what I remember happening." Apart from

15

that, the visits were positive: Mother and Minor told each other they loved each other; Mother brought games, toys, art supplies, and snacks to the visits; Minor was excited to see Mother; and Mother told Minor she wanted to encourage him and wanted him to do well in school. The social worker reported that the supervised phone calls between Minor and Mother went well when they occurred. Minor often did not want to have phone calls, and would say, "No thanks. Not today."

The social worker recommended family reunification services rather than family maintenance, because Mother had not engaged in the services to which she had been referred: Mother had missed her last five drug tests; she had not started any substance treatment services; and she had not allowed the Department to assess her mental health. The social worker stated that family maintenance would require a safety plan, which would include enrolling Minor in school, Mother participating in case plan services, and Mother allowing access to the home and allowing the department access to Minor. The social worker also expressed concern that, based on information she had received that maternal grandfather had sold the house where Mother was living, Mother would soon have no residence, which, according to the social worker, would prevent the implementation of a safety plan. The social worker recommended that reunification services include substance use treatment; a mental health assessment; counseling, including conjoint counseling for Mother and Minor; and a parenting program conducted by a facilitator from whom the Department could get feedback.

      c.    *Mother's Testimony*

Mother testified that sister had several medical issues over the past few years and that she had taken sister to appointments to address conditions as they arose and arranged for follow-up care as needed. She

testified she took sister to the dentist every six months, and arranged for whatever cleaning and care was needed. At age 14, sister was referred to a specialized dentist for root canals, and had multiple visits. Mother was told the temporary caps on the root canals would last a year, but they were never replaced with permanent caps. Mother testified that sister was regularly seeing a dentist from age 13 or 14 through September 2023, and that in July 2023, one of the temporary caps failed and was replaced.

Mother testified that Minor never had any significant medical issues. She took him to an eye doctor when he was four or five, and he was prescribed glasses, which he wore. She took him to the dentist every six months, and at some point he had oral surgery, which involved a root canal and a cap. He also had four extractions. His last dental appointment was in September 2023. Mother said she had given Minor NyQuil for about two or three weeks at the recommendation of a pharmacist and advice nurse because he had a nighttime cough.

Mother testified she had been homeschooling Minor since he was six. Asked whether she and Minor met periodically with a teacher who would check in with Minor, Mother responded, "So with homeschooling, I would be considered his teacher and the structure, an hour and a half per day." Asked where she got her curriculum, she responded, "I utilized learning workbooks, puzzles, sight words, dry erase board, letter math cubes, virtual classroom, virtual tours, virtual field trips." She explained that "virtual classroom" is "an opportunity to attend with tutors, with other homeschooling classes; with other alphabet numbers, math games." Minor's participation in virtual programs depended on the subject and whether Minor was struggling. She reported that Minor "did really well." Asked who assessed how Minor was doing, Mother responded that there was no real testing or assessment for

17

homeschooled children until fifth or sixth grade. Mother testified that in September she started the process of enrolling Minor in an online charter school "home study options program" which was to be a "supplement to me still homeschooling." Mother testified that Minor was attending the charter school, and meeting with charter school tutors from October 2023 until he was detained in February 2024, and also testified that Minor never attended the program officially because the enrollment process was not completed by the time Minor was removed from her care.

Mother testified about her own health issues and prescribed medication; she denied crushing and snorting her medication. She had never been diagnosed with a mental health disorder.

With respect to services, Mother testified that she had been drug testing and that at her attorney's suggestion she had completed a four-hour online parenting course.

d. *Sister's Testimony*

Sister testified that she first recalled going to the dentist once when she was four or five; her next visit to the dentist was at age 12, when she was told that she had 13 cavities. She went back a month or two later to have some cavities filled, and then saw another dentist. By that time, two of the remaining cavities had grown and required root canals instead of fillings. She had the two root canals at age 13, and received temporary crowns; but did not go to any further dental appointments until she was 17, even though she still had existing cavities, which had not been filled. Sister was aware that she was supposed to get permanent crowns on the teeth with root canals but Mother never took her to get them.

Sister testified that for several months in 2023, she experienced sharp, throbbing pain in her teeth because of an exposed nerve. It was hard to eat

18

without experiencing pain, and she would sometimes wake in the middle of the night because of the pain. Sometimes the pain prevented her from focusing at school.

Sister testified that she did not tell Mother about her dental pain because when she brought up health issues, Mother would attribute them to an infection; sister was concerned that her dental issues would also be attributed to the infection and would not be properly resolved. Mother started talking about the infection, which purportedly affected Mother, sister, Minor, and the family dog, in about 2020. Mother told sister that an infection in her mouth was causing her teeth to degrade, and she took sister to an ear, nose, and throat doctor a few times at the end of 2022. The doctor did not find an infection. In August of 2023, sister finally told Mother about the dental pain, and Mother made a dental appointment for her in September. The dentist said that the teeth with root canals had broken down because they never received permanent crowns; those teeth would have to be extracted. In addition, sister needed more root canals and more fillings. From October to December 2023, she had three further root canals which were completed at appointments that Mother had made for her. The other cavities were not filled until after sister went to live with aunt.

Sister testified that Minor "very rarely" played with other children. Once a month, at most, when they went to grandmother's house, he would play with her neighbors' grandchildren, if they were visiting their grandparents. Minor became friends with those children, but saw them infrequently.

e.    *Argument*

The Department argued that the court should sustain the allegations with respect to Mother under section 300, subdivisions (b)(1) and (j). As for

19

disposition, the Department argued that the court should provide reunification services rather than family maintenance because of Mother's failure to cooperate with the Department during the proceeding. The Department expressed concern that Mother would not cooperate in ensuring that Minor was participating in services and would not follow up on any medical advice that was provided.

Minor's counsel joined the Department's arguments. He argued that Mother's failure to provide necessary dental care to sister, who at age 17 was able to identify medical issues and advocate for herself, was evidence of risk to Minor, who was only nine years old. Counsel argued that the risk to Minor was enhanced because sister was no longer living in the home and could no longer help to identify Minor's medical concerns or protect him and advocate on his behalf.

Mother's counsel opened her argument by stating, "Your Honor, I understand why initially this case was of concern. This very bench officer received a report that the children in a particular home were not getting any medical care . . . . So of course this got referred to CPS. [¶] Social Service did an investigation and determined that the reports were inconclusive and did not file a petition. This court then filed an application to review the decision by the social worker not to commence proceedings, and after that the agency did file a petition. [¶] I understand that the mother's first attorney who oversaw several hearings asked about the court's ability to be impartial in this case, and the court made a record of the ability to be impartial and that's fine. [¶] But my first issue with this case is that there's the appearance. And how does the member of the community, [Mother], accept that the very person who challenged the agency's original report and the very person that pushed the issue of this investigation, and this petition is hearing the

20

jurisdiction and disposition case. I don't know how that's something that can be overcome in a way that gives this community member confidence in the court system because of the appearance it gives, whether or not I have confidence in this bench officer. But whether or not the bench officer is truly capable of impartiality given those circumstances. I'll set that aside for now and leave it there. [¶] But I do want to say that what's happened since then is again flawed. I won't call the previous thing flawed. I apologize. I am very respectful of this court. I actually have a lot of confidence in this particular court." Counsel then addressed the jurisdictional and dispositional issues, arguing that the Department had failed to prove a substantial risk to Minor of serious harm or illness, and that even if the court took jurisdiction, Minor should be at home with Mother with family maintenance services.

   f. *Ruling and Order*

  The court prefaced its ruling by noting that sister, who at 17 was old enough to articulate what she needed or wanted, had articulated needs for herself and Minor, including Minor's need for education. The court found Mother's testimony regarding her efforts to educate Minor to be not credible and found sister's testimony about Mother's not meeting her dental needs to be credible, including sister's testimony that she had gone four years without seeing the dentist. The court found that there were periods when sister's dental needs were not met, which resulted in extensive dental work, pain, and tooth loss.

  The trial court found true by a preponderance of the evidence the allegations against Mother with regard to section 300, subdivisions (b)(1) and (j), as amended by the court to conform to proof. The court found that the Department had not proved mental illness or substance abuse by a preponderance of the evidence; those allegations were stricken, as were

21

allegations concerning Mother's belief in a fungal infection, which the court concluded was "just very minimal." The court said, "What I heard is that [Mother] has been negligent in ensuring proper dental care for her children, or for [sister], and ensuring that [Minor] has a proper education. [¶] For me, the fact that [sister] is physically . . . impacted by mother's negligence is really telling of the level of neglect at home." With respect to section 300, subdivision (b)(1), the court found that Mother's neglect places Minor and sister at substantial risk of serious physical harm and illness. (See § 300, subd. (b)(1)(A) [authorizing jurisdiction on proof that child has suffered, or there was a substantial risk that the child will suffer, serious physical harm or illness as a result of the failure or inability of parent or guardian to adequately supervise or protect the child].) The court found that Mother was unable to provide regular care for them due to neglect, as she failed to obtain timely and adequate medical and dental care for them; that Mother failed to address sister's significant dental needs in a timely manner, resulting in sister suffering excruciating pain for a prolonged period; and that Mother failed to enroll Minor in school, which resulted in his being academically behind and unable to write. With respect to section 300, subdivision (j), the court found that sister suffered or was at substantial risk of suffering serious physical harm or illness from Mother's failing to obtain adequate and timely medical and dental care for her significant needs, resulting in great pain for a prolonged period, and that such actions by Mother place Minor at substantial risk of serious physical harm or illness.

In addressing disposition, the court stated that it had considered but rejected the possibility of family maintenance, which would require Mother to allow the Department to come to her home, see Minor in the home, and speak with Minor, based on Mother's lack of cooperation with the Department up to

22

that point and her not committing to send Minor to in-person school. The court found by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of [Minor] if [he] were returned home, and there are no reasonable means by which [Minor's] physical health can be protected without removing [him] from [Mother's] physical custody." (§ 361, subd. (c)(1).) The court ordered family reunification services, scheduled a six-month status review hearing, and scheduled an interim review in two months for an update on the appropriateness of family maintenance services.

This appeal followed.

## DISCUSSION

A.   *Due Process*

Mother asserts she was denied her constitutional right to an impartial judge, arguing that because Judge Rios played a "direct, personal role" in the commencement of the dependency proceeding, her recusal was required under the due process clause of the Fourteenth Amendment. Mother's due process claim presents an issue of law, which we review de novo. (*In re A.B.* (2014) 230 Cal.App.4th 1420, 1434.)

As an initial matter, we reject the Department's argument that Mother forfeited her constitutional claim by failing to seek writ review of Judge Rios's refusal to disqualify herself from hearing the proceeding under Code of Civil Procedure section 170.3, subdivision (d). Our Supreme Court has held that the failure to seek writ review does not bar review on appeal of a claim that an appealable order is constitutionally invalid because of judicial bias. (*People v. Brown* (1993) 6 Cal.4th 322, 335.) Although Mother did not argue below that her constitutional right to due process was violated by Judge Rios presiding over the case, we exercise our discretion to reach the issue in this

23

appeal. (See *In re T.G.* (2013) 215 Cal.App.4th 1, 14 [appellate court may review an error involving due process rights despite party's failure to raise claim below].)

With respect to the merits of Mother's argument, we find no support for her claim Judge Rios played a "direct, personal role" in the commencement of Minor's dependency proceeding. In filing the Judicial Council forms that led to the Department filing its petition, Judge Rios acted in her role as the probate court, as expressly authorized by the Probate Code and the Welfare and Institutions Code.[9] In form JV-210 under the heading "Probate Court Referral," Judge Rios, as a judicial officer, referred the matter to the Department for an investigation to determine whether proceedings should be commenced based on allegations in the guardianship petition that aunt and uncle had filed. (Prob. Code, § 1513, subd. (b).) Based on the allegations in the guardianship petition, which aunt and uncle had signed under penalty of perjury, Judge Rios had determined only that Minor "is or may be described by" section 300, and on that basis she referred the matter to the Department. Contrary to Mother's assertion on appeal, Judge Rios did not herself allege that Minor was suffering from severe neglect when she identified the reasons

_____

[9] The Legislature has expressed its "intent . . . that the guardianship laws in [the Probate Code] and the juvenile court laws in the Welfare and Institutions Code operate together as a *cohesive statutory structure that ensures all cases referred by the probate court for a child welfare investigation are subject to review by the juvenile court* without limiting the probate court's ability to take immediate action to protect the child while the child welfare investigation and juvenile court review are pending. *The purpose of this statutory structure is to ensure the protection of every child's health, safety, and welfare and to provide due process to every child, parent and family.*" (Prob. Code, § 1513, subd. (i), italics added.)

Minor "is or may be described by" section 300; instead, she was relaying information from the guardianship petition.

We note that the form JV-210 completed by Judge Rios is designed to be used for referrals submitted by individuals as well as by probate courts. (See § 329, subd. (a) [authorizing "a person" to apply to the social worker to commence dependency proceedings].) Although the instructions for form JV-210 form direct the probate court to skip the portion entitled "Part II. Applicant's Affidavit," Judge Rios filled out that part of the form as well as the part labeled "Part III. Probate Court Referral." She imparted essentially the same information in both parts of the form. In completing the affidavit in Part II, Judge Rios clearly indicated that she was making the submission in her role as probate court judge and not as an individual. For example, the "Applicant's Affidavit" requires the applicant to specify his or her relationship to the child being referred: Judge Rios specified "Superior Court Judge." And in providing facts to support of the application, Judge Rios did not claim personal knowledge, but prefaced the allegations with, "Per guardian –." Her name in the signature block is typed as "Judge Dora M. Rios." To the extent Mother argues that Judge Rios's completion of this portion of the form reflects Judge Rios taking a "direct, personal role" in the initiation of the dependency proceeding, Mother elevates form over substance.[10]

Nor does Judge Rios's completion of form JV-212, by which the probate court applied for review of the social worker's decision not to commence

_____

[10] Immediately above the signature block on the "Part II. Applicant's Affidavit" (where the court's name is typed in as "Judge Dora M. Rios"), is a preprinted declaration under penalty of perjury that the foregoing is true and correct. But this no more made Judge Rios into an interested party than did completion of the rest of the form.

proceedings, mean that Judge Rios became "a party to that controversy" with the Department who therefore (Mother contends) cannot permissibly "decide the truth of the petition she requested be filed."  As Judge Rios aptly put it, she completed form JV-212 because, as contemplated by the statute, she saw a need for a different judge to take a "second look . . . or review" of the Department's decision not to file a petition in light of the fact that she had received reports of two separate investigations, one by the probate court investigator and one by the Department, with different information reflected in the reports.  The second judge (Judge Davis), not Judge Rios, ordered the Department to file a petition under section 300.  Mother asserts that there would be no bar to Judge Davis hearing the dependency (even though she would be deciding the truth of the petition she *ordered* to be filed), and contends that the difference between Judge Rios and Judge Davis hearing the dependency is that Judge Rios, unlike Judge Davis, had "becom[e] a party to a controversy with" the Department—a contention we reject.

To support the assertion that Judge Rios asked the juvenile court to "adjudicate[ ] a controversy" between herself and the Department when she sought review of the Department's decision not to commence proceedings and that this act made Judge Rios "a party to that controversy," Mother relies on *In re M.C.* (2011) 199 Cal.App.4th 784 (*M.C.*).  The case does not help her. *M.C.* addressed whether section 331 violates article III, section 3, of the California Constitution, and held that it does not:  a juvenile court does not violate the separation of powers doctrine when it orders the county social services agency to file a dependency petition on behalf of a minor.  (*Id.* at p. 815.)  When the Court of Appeal in *M.C.* referred to the juvenile court as "adjudicat[ing] a controversy" in deciding a section 331 petition, it was to underscore its disagreement with the argument made by the appellant social

26

service agency that in deciding the petition the juvenile court was performing an "inherently nonjudicial function." (*Id.* at p. 813.) Further, and importantly, in *In re M.C.*, a private individual/entity (Legal Services for Children (LSC), serving as counsel for M.C.) filed an affidavit under section 329 to commence juvenile dependency proceedings for a homeless minor who came to the United States to escape physical abuse by his father; when the county social services agency declined to proceed, LSC sought review under section 331. (*Id.* at pp. 789, 792.) *M.C.* did not address the situation in which review under section 331 is sought in connection with the procedures set forth in Probate Code section 1513, as Judge Rios did here. To the extent there was a controversy for the juvenile court to decide in response to Judge Rios's application for review of the Department's decision not to commence proceedings, it was not a controversy to which Judge Rios was herself a party.

Contrary to Mother's assertions, this is not a case that presents "extreme facts" in which "the probability of actual bias rises to an unconstitutional level." (*Caperton v. A.T. Massey Coal Co., Inc.* (2009) 556 U.S. 868, 872, 886-887 [due process violated when state supreme court justice hearing party's case had "received campaign contributions in an extraordinary amount from, and through the efforts of, [a party's] board chairman and principal officer"].) This is not a case like *In re Murchison* (1955) 349 U.S 133, 134, where a trial court judge violated defendants' due process rights by acting as a " 'one-man judge-grand jury' "—that is, questioning the defendants in secret hearings about suspected illegal activities and charging them with contempt based on their conduct in those hearings—and then presiding over the resulting contempt proceedings. Nor is this a case like *Williams v. Pennsylvania* (2016) 579 U.S. 1 (*Williams*), where the Supreme Court reasoned that when a judge has played a "direct

personal role in the defendant's prosecution . . . there [is] a serious risk that [the] judge would be influenced by an improper, if inadvertent, motive to validate and preserve the result obtained through the adversary process." (*Id.* at pp. 10, 11.) In *Williams*, the district attorney who gave official approval to seek the death penalty later became a state supreme court justice, and in that role he heard a petition for relief from the defendant, who had been sentenced to death. (*Id.* at p. 4.) The Supreme Court concluded that due process required the justice to recuse himself because he "participate[d] in a major adversary decision." (*Id.* at p. 9.) Judge Rios, as we explained, did not have a "direct, personal role" in the initiation of the dependency proceeding, much less in any prosecution of Mother. The circumstances here do not involve "a judge [who] has served as an advocate . . . in the very case [she] is now asked to adjudicate." (*Ibid*.) Mother does not show there was any risk that Judge Rios's " 'own personal knowledge and impression' of the case" would carry more weight with her than the evidence and arguments properly before her. (*Id.* at pp. 9-10.)

Nor is this case like *Lois R. v. Superior Court* (1971) 19 Cal.App.3d 895, in which the Court of Appeal held that a mother's due process rights were violated when the referee conducting the jurisdiction hearing acted as an advocate for the agency, which was not present or represented at court. The referee examined and cross-examined witnesses, objected to questions asked and ruled on objections and motions made by mother's counsel, and found the allegations of the petition to be true. (*Id.* at pp. 897-898.) Nothing of that sort occurred here.

Because we conclude Mother has not shown a violation of her constitutional right to due process, we turn to her alternative argument that

she was prejudiced by her counsel's failure to follow the statutory procedures to disqualify Judge Rios from hearing the dependency case.

B.     *Ineffective Assistance of Counsel*

As we have noted, at the outset of the initial detention hearing in this dependency case, Judge Rios disclosed that she had filed the forms JV-210 and JV-212 that led to the filing of the dependency petition and gave the parties the opportunity to object.  Mother's counsel consulted with Mother and then reported that her client had no objection.  Subsequently, at the beginning of the contested detention hearing on February 21 and at the close of the contested jurisdiction/disposition hearing on July 9, Mother's attorneys asserted oral objections to Judge Rios presiding over the dependency, but they did not follow the procedures specified by statute to disqualify Judge Rios, nor was any writ petition filed to challenge Judge Rios's failure to disqualify herself.  (See Code Civ. Proc., § 170.3, subd. (d) [determination of disqualification of judge may be reviewed only by petition for writ of mandate].)  Correctly conceding that the failure to follow the statutory procedures bars appellate review of the merits of the disqualification claim (see *People v. Brown, supra,* 6 Cal.4th at p. 333 [Code Civ. Proc., § 170.3., subd. (d), precludes litigant from challenging denial of disqualification motion on appeal]), Mother argues that she received ineffective assistance of counsel, which requires reversal of the jurisdictional and dispositional orders.

To prevail on a claim of ineffective assistance of counsel, Mother must show not only that her attorney " 'failed to act in a manner to be expected of reasonably competent attorneys practicing in the field of juvenile dependency law' " but also that " 'it is reasonably probable' that a result more favorable to [her] would have been reached in the absence of the error." (*In re A.R.* (2021) 11 Cal.5th 234, 251-252 (*A.R.*).)  Generally, claims of ineffective

29

representation are raised in petitions for habeas corpus, which "allow[ ] for consideration of matters outside the appellate record, including evaluation of counsel's decisions and tactics, which is a necessary focus of many ineffective assistance claims." (*Id.* at p. 254). Nevertheless, an ineffective assistance claim may be raised in a direct appeal if " ' "there simply could be no satisfactory explanation" for trial counsel's action or inaction.' " (*In re Darlice C.* (2003) 105 Cal.App.4th 459, 463; see *People v. Maury* (2003) 30 Cal.4th 342, 389 ["[t]o the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation"].) We "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." (*Maury,* at p. 389.)

Mother argues that her first attorney provided ineffective representation by not taking steps to allow Mother to exercise her right to a so-called "peremptory challenge" of Judge Rios under Code of Civil Procedure, section 170.6, subdivision (a)(2), which authorizes a party to attorney to establish that a judge is prejudiced against them by filing a declaration to that effect or making an oral statement under oath early in the proceedings. (Code Civ. Proc., § 170.6, subd. (a)(2) [party can establish prejudice by declaring under penalty of perjury that judge is prejudiced against the party "so that the party . . . cannot, or believes that he or she cannot, have a fair and impartial trial or hearing before the judge"].) Mother contends that even though she stated at the initial hearing that she had no objection to Judge Rios hearing the case, she could have exercised her right to a peremptory challenge at the contested detention hearing, which occurred five days later. (See *Johnny W. v. Superior Court* (2017) 9 Cal.App.5th 559, 565-567

[otherwise timely challenge under Code Civ. Proc., § 170.6 may be made after initial dependency hearing at which court temporarily detains child but does not determine any contested factual issues relating to merits or consider any evidence other than detention report].) Mother argues that instead of making an oral objection on Mother's behalf to Judge Rios hearing the case, her counsel could have and should have requested a continuance to obtain a declaration from Mother as to her belief in Judge Rios being prejudiced against her, and that there is no satisfactory explanation for her counsel's failure to do so. For the purposes of argument, we will assume that Mother could properly challenge Judge Rios under Code of Civil Procedure section 170.6 at the contested disposition hearing, even though Mother stated at the initial hearing that she had no objection to Judge Rios hearing the case. But it may be that counsel had previously discussed, or tried to discuss, with Mother the possibility of such a challenge, and that Mother declined to sign the required affidavit or declined to respond to her attorney.[11] (Code Civ. Proc., § 170.6, subd (a)(2).) In those circumstances, Mother's counsel could have decided to make an oral objection in an attempt to convince Judge Rios to disqualify herself.

Mother also argues that her first and second attorneys provided ineffective assistance by failing to file written verified statements objecting to

_____

[11] The record reflects that Mother and her counsel had been present at court the previous day (apparently for the contested disposition hearing in sister's case), and that counsel had been in communication with Mother earlier on the day of Minor's contested disposition hearing. We note that although Mother's counsel voiced Mother's objection ("on the basis of the way that this came in"), she did not state that Mother believed Judge Rios was prejudiced against her or that Mother believed she could not have a fair and impartial hearing before Judge Rios. (Cf. Code Civ. Proc., § 170.6, subd. (a)(2) [requirements for sworn statement establishing prejudice].)

31

Judge Rios hearing the dependency case and setting forth facts showing that Judge Rios's disqualification was required because "[a] person aware of the facts might reasonably entertain a doubt that [she] would be able to be impartial." (Code Civ. Proc., § 170.1, subd. (a)(6)(A)(iii); see *id.,* § 170.3, subd. (c) [procedure for disqualifying judge who refuses or fails to disqualify himself or herself].)

As for the first attorney, Mother contends that there can be no satisfactory explanation for the attorney stating at the contested disposition hearing that Mother wanted a different judge "on the basis of the way that this [case] came in" but not filing a verified statement to disqualify Judge Rios as required by Code of Civil Procedure section 170.3, subdivision (c)(1). However, Mother and her attorney could have determined that an attempt to disqualify Judge Rios on the basis of an appearance of partiality was likely to fail, because a person aware of the facts—including the statutory procedures for the referral of cases from the probate court to the Department and the juvenile court, as well as Judge Rios's detailed explanation of her actions pursuant to those statutes—would not reasonably entertain a doubt of Judge Rios's impartiality. In the face of the difficulty of making the necessary showing for disqualification, Mother's attorney could have made the tactical decision to voice Mother's objection in the hope that Judge Rios would simply recuse herself.

Mother's second attorney was appointed three months after the Department filed its petition. Almost two months after her appointment, as part of her closing argument on the third day of the contested jurisdiction and disposition hearing, she made an oral objection to Judge Rios hearing the case, asserting Mother's lack of "confidence in the court system because of the

32

appearance it gives," as we have described.[12]  Mother argues that there was no reason for her attorney to make an oral objection rather than filing a written verified statement as required by statute.  We disagree.  Mother disregards the provision in Code of Civil Procedure, section 170.3, subdivision (c)(1), requiring that the verified statement "be presented at the earliest practicable opportunity after discovery of the facts constituting the ground for disqualification."  (See Code Civ. Proc., § 170.4, subd. (b) [authorizing trial court to strike untimely filed statement of disqualification]; *Tri Counties Bank v. Superior Court* (2008) 167 Cal.App.4th 1332, 1337 [failure to comply with the "strict promptness requirement" of Code Civ. Proc., § 170.3, subd. (c), "constitutes forfeiture or an implied waiver of the disqualification"].)  Recognizing that even if there had been any merit to the disqualification claim, any statement she filed would likely be stricken as untimely, Mother's second appointed counsel could have made the tactical decision in the wake of the testimony presented at the hearing to voice an oral objection as a last-ditch attempt to have Judge Rios recuse herself so a new judge could be assigned to hear Mother's case.

Thus, Mother's claim of ineffective assistance of counsel fails because Mother does not show that there can be no satisfactory explanation for her attorneys' actions.  But even if Mother had made that showing, her claim would fail because Mother does not show prejudice.  (*A.R.*, *supra*, 11 Cal.5th at p. 252.)  Assuming for the purposes of argument that Mother had shown it

---

[12] In the weeks between being appointed to represent Mother and the beginning of the contested hearing, Mother's second appointed counsel had twice appeared at court with Mother and had filed papers with the court on Mother's behalf, including objections to the admission of hearsay evidence and a motion to dismiss the dependency, but had never asserted any objection to Judge Rios hearing the case.

is reasonably probable that a different judge would have been assigned to the dependency if her attorneys had pursued the disqualification of Judge Rios, Mother does not show a reasonable probability that a different judge would have issued jurisdictional and dispositional rulings more favorable to her. In arguing prejudice Mother suggests that Judge Rios's "preconceived notions" may have "tipped the scales" against her—a suggestion we disregard because nothing in the record shows that Judge Rios prejudged the case. To the contrary, the record shows that after hearing all the evidence Judge Rios declined to sustain allegations in the dependency petition concerning Mother's mental illness and substance abuse, even though those allegations appear in the guardianship petition and therefore in the form JV-210 that Judge Rios submitted to the Department. Mother's only other argument with regard to prejudice is her assertion that the lack of substantial evidence to support the trial courts jurisdictional and dispositional orders (issues we address below) proves that a different judge "*could have* determined jurisdiction and/or removal was not warranted." (Italics added.) The argument is unpersuasive because Mother cites no authority to suggest that the mere fact that a different judge "could have" ruled differently from Judge Rios is equivalent to a showing of a reasonable probability that a different judge *would have* entered orders more favorable to her. (*A.R.,* at p. 252.)

C.    *Jurisdictional Findings*

We review the juvenile court's jurisdictional findings for substantial evidence, reviewing the record to determine whether the findings are supported by substantial evidence, contradicted or uncontradicted. (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 184.) " '[W]e draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the

34

court's determinations; and we note that issues of fact and credibility are the province of the trial court.' " (*Ibid.*) If the juvenile court's finding of jurisdiction can be upheld on one ground, we need not review other grounds on which the court found jurisdiction. (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 875-876 (*Jonathan B.*).)

We conclude that substantial evidence supports the trial court's finding that Minor is described by section 300, subdivision (j), which applies when a "child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i) [of section 300], and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." (§ 300, subd. (j).)

The jurisdiction/disposition report and the testimony offered by the social worker, sister, and aunt concerning sister's untreated cavities and cracked teeth, and the resulting pain that sister endured constitute substantial evidence to support the trial court's finding that sister had suffered serious physical harm, in the form of "excruciating pain" that she endured "for a prolonged period of time," as a result of Mother's negligent failure to provide her with adequate medical and dental care. Accordingly, there is substantial evidence to support the finding that sister had been abused or neglected as defined in section 300, subdivision (b). (See § 300, subd. (b)(1)(C) [authorizing jurisdiction if a child suffered "serious physical harm . . . as a result of . . . [t]he willful or negligent failure of the parent . . . to provide the child with adequate . . . medical treatment"].)

The record also contains substantial evidence that Minor is at substantial risk of being abused or neglected as defined in section 300, subdivision (b). The trial court found "neglect of [Minor's] needs at home" based on Mother's failure to ensure proper dental care for her children, as

35

well as failure to ensure that Minor received an education. Although Minor had no acute medical or dental needs at the time he was removed from Mother's care, there was evidence that Minor, who had already by age nine had one root canal and several extractions, had not been to the dentist for more than one year. In light of the testimony that sister had not been to the dentist for a period of four years, during which she had cavities that remained unfilled and temporary crowns that were not replaced by permanent crowns, and that she had suffered considerable physical pain as a result, the court could find that Minor was at substantial risk of suffering serious physical harm or illness as a result of being similarly neglected. The court also found that sister suffered neglect and physical pain despite being old enough to articulate her needs and wants; the court could properly infer that Minor, who was several years younger and more dependent on Mother, was at substantial risk of physical harm from the same kind of neglect that sister had suffered. (See § 300, subd. (j) [in determining whether there is substantial risk to the child, the court is to consider factors that include "the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, [and] the mental condition of the parent or guardian"].)

Mother argues that there is "speculation but no actual proof of an impending medical need by [Minor]" and emphasizes the lack of evidence that Minor had any acute medical needs when he was taken from Mother's care. But "[t]he court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.) Here, the evidence that Minor, who had already experienced dental issues including a root canal before the age of nine, had not been to the dentist for more than a year provides "some reason

36

beyond mere speculation" to believe that Minor was at substantial risk of harm. (*In re Ricardo L.* (2003) 109 Cal.App.4th 552, 565; see also *In re I.J.* (2013) 56 Cal.4th 766, 778 ["the more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect"].)

Because we conclude that substantial evidence supports the juvenile court's jurisdictional finding under section 300, subdivision (j), we need not reach Mother's arguments concerning the court's other jurisdictional findings. (*Jonathan B.*, *supra*, 5 Cal.App.4th at pp. 875-876.)

D.   *Dispositional Findings*

"We review a juvenile court's dispositional order removing a child from parental custody for substantial evidence, ' "bearing in mind the heightened burden of proof." ' [Citation.] 'Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt.' [Citation.] Still, the appellant bears the burden of showing ' "there is no evidence of a sufficiently substantial nature" ' to support the dispositional removal order." (*In re L.O.* (2021) 67 Cal.App.5th 227, 245.)

The juvenile court articulated two reasons for removing Minor from Mother's custody and ordering reunification services rather than returning him to Mother's custody and ordering family maintenance services: Mother's lack of cooperation with the Department up to that point and Mother's not committing to send Minor to in-person school. Mother argues that her failure to voluntarily cooperate with the department did not mean that she would refuse to follow court orders once the court took jurisdiction of Minor, and argues that there was no evidence that Minor's not attending school put him in substantial danger. The Department offers no argument in response.

37

We do not minimize the importance of Minor receiving an adequate education. There is no dispute that Minor was never enrolled in school, and we do not question the trial court's finding that Mother's testimony regarding her homeschooling of Minor lacked credibility. Yet we agree with Mother that there was no evidence that Minor's failure to receive an adequate education while under her care put him in substantial physical danger.

Our analysis is different with respect to Mother's undisputed failure to cooperate with the Department. (See *In re John M.* (2012) 212 Cal.App.4th 1117, 1127 [juvenile court may consider parent's history of cooperating with the social service agency in determining whether child can be safely returned to parent's custody].) The social worker who was assigned to the case in February 2024 made multiple attempts to engage with Mother; Mother declined to meet with her and spoke with her only once. Mother declined to provide the Department with Minor's medical records; she declined to provide information or documentation about Minor's purported enrollment in the online charter school; she declined to provide documentation of her prescription drugs until the first day of the contested jurisdiction/disposition hearing, despite being asked numerous times; she stopped drug testing several weeks before the contested hearing; and she declined to participate in other services offered by the Department. Mother's failure to cooperate necessarily predates the court taking jurisdiction, and does not necessarily mean that Mother will fail to obey court orders or participate in a court-ordered reunification plan. Nevertheless, these facts, taken together with the juvenile court's explicit findings that Mother had neglected Minor's needs, that Mother's sworn testimony as to Minor's education was not credible, and that sister's testimony was credible, as well as its implicit findings that Mother's testimony as to her own drug use and sister's dental care was not

38

credible, constitute substantial evidence to support the juvenile court's finding at the disposition hearing that returning Minor to Mother's care, where there was no safety plan in place, posed a substantial danger to Minor's health, and that his health could not be protected without removing him from her custody. (§ 361, subd. (c)(1); see *In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1136 ["minor need not have been actually harmed before removal is appropriate"; "focus of the statute is on averting harm to the child"].)

In arguing that the juvenile court erred by not returning Minor to her care at disposition, Mother relies on *In re Ma.V.* (2021) 64 Cal.App.5th 11 (*Ma.V.*), where the Court of Appeal reversed jurisdiction and disposition orders in a dependency proceeding. With regard to disposition, the Court of Appeal held that the juvenile court erred when it removed children from their mother's care at disposition based primarily on the mother's lack of cooperation, evidenced by the mother avoiding opportunities to engage in voluntary (not court-ordered) services and by purportedly "put[ting] up several hurdles" that prevented the court or social services agency from verifying her participation in voluntary (not court-ordered) services. (*Id.* at p. 21, 24, 25.) But *Ma.V.* is of little help to Mother because the facts of that case are unlike those before us. The mother in *Ma.V.*, unlike Mother here, was forthcoming to the social service agency: she had timely executed a release to allow the agency to contact her service providers and it was not her fault that the agency had not obtained information (*id.* at p. 24); in multiple interviews, she not only answered questions posed by the social workers but also volunteered information that was not requested (*id.* at p. 25); she had a plan in place for help with care for the children if they were returned to her (*ibid.*); and in the time since the case had been filed, she had acknowledged and

resolved the issues that would have warranted jurisdiction.  (*Id.* at p. 24.) Nothing in *Ma.V.* supports Mother's claim of error.

## DISPOSITION

The jurisdictional and dispositional orders are affirmed.


_____
Miller, J.


WE CONCUR:


_____
Richman, Acting P. J.


_____
Desautels, J.


A170934, *Solano County Health and Human Services Dept. v. Kathryn B.*